# In the United States Court of Federal Claims

No. 10-716C

(Filed Under Seal:  August 8, 2011)
(Reissued:  August 12, 2011)

| | | |
|---|---|---|
| **NILSON VAN & STORAGE, INC.,** | ) | Post-award bid protest; small-business |
| | ) | set aside; responsibility determination; |
| **Plaintiff,** | ) | FAR § 9.100; responsiveness of bid to |
| | ) | the solicitation; FAR §§ 14.301, 14.405 |
| **v.** | ) | |
| | ) | |
| **UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

Francis M. Mack, Richardson, Plowden & Robinson, P.A., Columbia, South Carolina, for plaintiff.

James Sweet, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With him on the briefs were Tony West, Assistant Attorney General, Civil Division, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.  Of counsel was C. Peter Dungan, Major, U.S. Army, United States Army Legal Services, Arlington, VA.

**OPINION AND ORDER**[1]

LETTOW, Judge.

In this post-award bid protest, Nilson Van & Storage, Inc. ("Nilson Van") challenges the United States Army's award of a contract to Ken Krause Company ("Krause" or "Ken Krause") for the preparation, shipment, and storage of property belonging to Army personnel.  Both parties have filed motions for judgment on the administrative record which have been briefed and argued and are ready for disposition.

---

[1]Because this opinion and order might have contained confidential or proprietary information within the meaning of Rule 26(c)(1)(G) of the Rules of the Court of Federal Claims ("RCFC") and the protective order entered in this case, it was initially filed under seal.  The parties were requested to review this decision and to provide proposed redactions of any confidential or proprietary information on or before August 11, 2011.  No redactions were requested.

# FACTS[2]

On July 2, 2009, the Army at Fort Bragg, North Carolina, issued Solicitation No. W91247-09-B-0005, Inbound Packing and Crating ("Solicitation"). AR 3-17.[3]   The solicitation was for a small-business set-aside under North American Industrial Classification System ("NAICS") 488991, which limits the size of the contractor eligible to bid to $25.5 million or less in annual revenue.  AR 3-17 (Solicitation, Box 10).[4]

The solicitation required bidders to secure the appropriate permits and licenses if they were bidding to perform transportation services. The Performance Work Statement ("PWS") specified:

> The provisions of the FAR [*i.e.*, Federal Acquisition Regulations, 48 C.F.R. §] 52.247-2, Permit, Authorities, or Franchises, are applicable for qualification to perform services under this regulation. A prospective contractor engaged in interstate transportation shall be approved and hold authorization in their own name by the Interstate Commerce Commission, or, if engaged intrastate transportation, a certificate issued by the appropriate state regulatory body will be required.

AR 3-101 (Solicitation, Performance Work Statement ¶ 1.4).  The provision of the FAR cited in the Performance Work Statement, FAR § 52.247-2, states in part:

> The offeror shall furnish to the Government, if requested, copies of the authorization before moving the material under any contract awarded.   In addition, the offeror shall, at the offeror's expense, obtain and maintain any permits, franchises, licenses, and other authorities issued by State and local governments.

---

[2]The recitations that follow constitute findings of fact by the court drawn from the administrative record of the procurement.  *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (noting that bid protest proceedings "provide for trial on a paper record, allowing fact finding by the trial court").

[3]"AR __" refers to the administrative record filed with this court in accord with RCFC 52.1(a).  The administrative record has been subdivided into tabs.  The first number in a citation to the administrative record refers to a particular tab, and the number after the hyphen refers to the particular page number of the administrative record, *e.g.*, "AR 5-26."  The pages of the administrative record are paginated sequentially without regard to the tabs.

[4]The NAICS was developed "for use by Federal statistical agencies in classifying business establishments for the collection, tabulation, presentation, and analysis of statistical data describing the U.S. economy. . . .  Some contracting authorities require businesses to register their NAICS codes, which are used to determine eligibility to bid on certain contracts."  NAICS FAQ, http://www.census.gov/eos/www/naics/faqs/faqs.html (last visited August 5, 2011).

FAR § 52.247-2(b).

The Performance Work Statement also prescribed the standards for storage facilities under the contract.  For example, the winning contractor's warehouse was required to have an "acceptable automatic sprinkler system" or a "supervised fire detection and reporting system."  AR 3-128 (Solicitation, Performance Work Statement ¶ 5.8.5).  It must "not show evidence of insect and rodent infestation," and must "afford adequate protection from pilferage and theft."  AR 3-129 (Solicitation, Performance Work Statement ¶ 5.8.5.1).  In addition, FAR § 52.212-4(q) was incorporated into the Solicitation by reference, *see* AR 3-17 (Solicitation, Box 27a); AR 3-73 (Solicitation); that provision states, "The Contractor shall comply with all applicable Federal, State and local laws, executive orders, rules and regulations applicable to its performance under this contract."

Paragraph 5.8.6 of the Performance Work Statement further required the contractor's facility to "be initially inspected, if applicable, and . . . approved by a representative from the contracting office or PPSO [*i.e.*, Personal Property Shipping Officer] for compliance with this contract and the standards and regulations stated or referenced therein.  Thereafter, a satisfactory rating must be maintained during inspections held on a quarterly basis or, if deemed necessary, on a more frequent basis."  AR 3-129 (Solicitation, Performance Work Statement ¶ 5.8.6).

In addition to responding to the Solicitation, bidders were required to register in two government databases.  The Solicitation incorporated FAR § 252.204-7004 (Central Contractor Registration ["CCR"] ([FAR §] 52.204-7) Alternate A) by explicit reference and, implicitly, FAR §§ 52.204-7(b) to (h).  *See* AR 3-75 (Solicitation).[5]  Section 52.204-7 states,

> By submission of an offer, the offeror acknowledges the requirement that a prospective awardee shall be registered in the CCR database prior to award, during performance, and through final payment of any contract, basic agreement, basic ordering agreement, or blanket purchasing agreement resulting from this solicitation. . . . If the Offeror does not become registered in the CCR database in the time prescribed by the Contracting Officer, the Contracting Officer will proceed to award to the next otherwise successful registered Offeror.

---

[5]The Solicitation specifically incorporated FAR § 252.204-7004 by reference.  AR 3-75 (Solicitation).  Section 252.204-7004 provides an alternate section (a) for FAR § 52.204-7.  *See* FAR § 252.204-7004 ("[S]ubstitute the following paragraph (a) for paragraph (a) of the clause at FAR 52.204–7.").  Citing the page of the Solicitation which incorporates FAR § 252.204-7, Nilson Van asserts that "[t]he [S]olicitation includes by reference FAR [§] 52.204-7."  Pl.'s Mot. at 8 (citing AR 3-75).  The government does not disagree with this interpretation.  *See* Def.'s Cross-Mot. at 24 ("[T]he [S]olicitation included FAR [§] 52.204-7, Central Contractor Registration."); *id.* at 29 ("Nilson relies upon FAR [§] 52.204-7, which the [S]olicitation incorporates by reference, to establish [Ken Krause's] duty to register with the CCR.") (citing AR 3-75).

FAR § 52.204-7(b)(1), (d).  The Solicitation also required prospective contractors to register in the Online Representations and Certifications Application database, through incorporation of FAR § 52.212-3 into the Solicitation.  AR 3-76 to 86 (Solicitation).

Two offerors responded to the solicitation, Nilson Van and Ken Krause.  Nilson represented that it could perform the contract for $1,394,577.50, and Ken Krause represented it could perform the contract for $1,088,732.60, including the base and option years.  *See* AR 10-197 (Nilson Van Bid Work Sheet); AR 19-379 (Letter from Ken Krause to Sharon Carter (May 17, 2010) (listing bid as $1,088,732.60)); *see also* AR 11-262 (Ken Krause Bid Work Sheet) (listing bid as $1,098,124.49).

Krause's bid specified that its name and address was "Ken Krause Co[.;] 148 Rice Rd[.;] Vass[,] NC 28394."  AR 11-262 (Ken Krause Bid Work Sheet); AR 11-263 (Ken Krause Bid, Box 8); AR 11-268 (Ken Krause Bid, Box 17a).  On April 14, 2010, Ken Krause e-mailed the Army to state that it intended to use facilities in Southern Pines, NC, and Carthage, NC, to store goods during performance of the contract.  *See* AR 22-383 (E-mail from Ken Krause to Sharon Carter (Apr. 14, 2010)).  Krause offered to host a site visit to those facilities.  *Id.*  The Contracting Officer and others inspected the facilities on April 19, 2010, took photographs, and determined that the facilities met the requirement of the Performance Work Statement.  *See* AR 1-2 to 3 (Agency Report (July 6, 2010)); AR 22-383 (E-mail from Carter to Krause (Apr. 16, 2010)); AR 25-388 to 418 (Photographs from Ken Krause Warehouse Inspection); AR 27-426 (Determination of Responsibility for Ken Krause (May 27, 2010)) ("[W]e found both warehouses to be in full compliance with the Performance Work Statement.").

The government awarded the moving and storage contract to Ken Krause on May 27, 2011.  *See* AR 27-420 (Contract Award Decision Statement (May 27, 2011)).  Nilson Van protested the award to the Government Accountability Office ("GAO"), which denied the protest on August 19, 2010.  *See Nilson Van & Storage, Inc.*, No. B-403009, 2010 CPD ¶ 198, 2010 WL 3328658 (Comp. Gen. Aug. 19, 2010).  Nilson then filed a complaint in this court.

After resolution of procedural issues and other threshold matters, *see Nilson Van & Storage, Inc. v. United States*, 2011 WL 477704 (Fed. Cl. Feb. 7, 2011), both parties moved for judgment on the administrative record and a hearing was held on the cross-motions.  The case is now ready for resolution.

### STANDARDS FOR DECISION

Under 28 U.S.C. § 1491(b)(4), this court's review of an agency's decision regarding a contractual solicitation or award is governed by the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706.[6]  In accord with those standards, the court may set aside an agency contracting decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), subject to application of factors governing

---

[6]Section 1491(b)(4) of Title 28 provides: "In any action under [28 U.S.C. § 1491(b)], the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."

equitable relief. *See PGBA, LLC v. United States*, 389 F.3d 1219, 1224-28 (Fed. Cir. 2004). Judicial review is limited to determining whether the agency's "decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated in part by Califano v. Sanders,* 430 U.S. 99, 105 (1977) (abrogating *Overton Park* to the extent it recognized the APA as an independent grant of subject matter jurisdiction).

An agency's decision will be upheld even if the court might have applied the procurement regulations in a different fashion had the court been in the agency's position. *See Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)); *Lumetra v. United States,* 84 Fed. Cl. 542, 549 (2008) ("[T]he court 'will not second guess the minutiae of the procurement process in such matters as technical ratings and the timing of various steps in the procurement.'" (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996))). A court must not "'substitute its judgment for that of the agency,'" *Keeton Corrs., Inc. v. United States,* 59 Fed. Cl. 753, 755 (2004) (quoting *Overton Park,* 401 U.S. at 416), and it may overturn an agency's decision only "if '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Centech Grp., Inc. v. United States,* 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332 (Fed. Cir. 2001)).

When a court reviews a challenge to agency action that is alleged to be arbitrary or capricious or an abuse of discretion, it is obliged to "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Impresa Construzioni*, 238 F.3d at 1332-33 (quotation marks and citations omitted). "[T]he disappointed bidder thus bears a heavy burden of showing that the award decision had no rational basis." *Id*. at 1333 (quotation marks and citations omitted). An agency's decision lacks a rational basis if the contracting officer "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Keeton Corrs.,* 59 Fed. Cl. at 755 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)). "When a challenge is brought on [a claimed contravention of law], the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Impresa Construzioni*, 238 F.3d at 1333 (quotation marks and citations omitted).

## ANALYSIS

Nilson's contentions are threefold. First, Nilson argues that Ken Krause was a "non-responsible bidder because it was not qualified per [paragraph 1.4] of the Performance Work Statement regarding proper licensing and certification." Second Am. Compl. ¶ 21. Second, Nilson argues that Ken Krause was a "non-responsible bidder because it was not qualified per [paragraph 5.8] of the Performance Work Statement regarding proper storage facilities." *Id*. ¶ 22. Finally, Nilson alleges that Ken Krause was "a non-responsive bidder because it violated the provisions of the Performance Work Statement requiring proper registration with government contractor databases." *Id*. ¶ 24. Nilson asks the court to set aside the award to Ken Krause and

to award the contract to Nilson or, alternatively, to set aside the award and remand the matter to the Army to rebid the contract. *Id.* ¶ 30; Hr'g Tr. 9:1-5 (July 20, 2011). Nilson also asks that the court enjoin the Army from allowing Ken Krause to continue performing the contract. Second Am. Compl. ¶ 32.

## A. *The Contracting Authority's Responsibility Determination*

Federal Acquisition Regulation subpart 9.1 "prescribes policies, standards, and procedures for determining whether prospective contractors and subcontractors are responsible." FAR § 9.100. It applies to "all proposed contracts with any prospective contractor that is located . . . [i]n the United States." FAR § 9.102(a)(1). The regulation requires that "[p]urchases shall be made from, and contracts shall be awarded to, responsible prospective contractors only." FAR § 9.103(a). A responsible contractor must, among other qualities, "[h]ave the necessary . . . facilities, or the ability to obtain them," FAR § 9.104-1(f), and "[b]e . . . qualified and eligible to receive an award under applicable laws and regulations." FAR § 9.104-1(g).

### 1. *Licensing and certification.*

Nilson argues that Ken Krause was unqualified under FAR § 9.104-1(g), and therefore not responsible, because it was not properly licensed and certified under paragraph 1.4 of the Solicitation's Performance Work Statement. Pl.'s Mot. at 4. Nilson Van emphasizes that the pertinent paragraph in the Performance Work Statement requires that "[a] *prospective* contractor" shall be approved and hold authorization or relevant certificate. *Id.* at 4-5 (quoting AR 3-101 (Solicitation, Performance Work Statement ¶ 1.4)) (emphasis added). The government responds that the Performance Work Statement required the contractor to "possess and present authorization or certification during performance, not prior to award." Def.'s Cross-Mot. at 14 (capitals omitted).[7]

Upon the submission of its bid, Ken Krause Company did not have the Federal Department of Transportation certifications, specifically certifications from the Federal Motor Carrier Safety Administration, to carry household goods as a for-hire carrier. AR 12-338 to 339 (Ken Krause's United States Dep't of Transportation "Company Snapshot") (specifying Ken Krause's operation classification as "Private (Property)"). But, although Ken Krause would need federal certifications to transport household goods for the Army interstate, "there is nothing in the solicitation or contract that requires interstate transportation of household goods." AR 1-7 (Agency Report (July 6, 2010)). Rather, the solicitation specified that the contract's area of

---

[7]The parties agree that Ken Krause did not need any licenses or certifications from North Carolina to transport household goods of military personnel, due to an agreement between North Carolina and the federal government. *See* AR 21-381 (E-mail from Mr. Bruce Ramaekers, Transportation Utilities Analyst, North Carolina Utilities Commission, to Ms. Antionette McGirt (Feb. 16, 2010)) (stating "it is correct that the North Carolina Utilities Commission (NCUC) does not require that a mover have a certificate of exemption, or any other certificate, from the NCUC to move household goods of military personnel under an agreement with the federal government"); *see also* Pl.'s Mot. at 7; AR 27-425 to 26 (Determination of Responsibility for Ken Krause Co. (May 27, 2010)).

performance included "Counties of Bladen, Cumberland, Harnett, Hoke, Lee, Moore, Richmond, Robeson, Sampson, and Scotland — all in North Carolina." AR 3-97 to 98 (Solicitation). No other locations were listed.

Some contract line items noted they might require service "not to exceed 150 miles" "beyond the contract area of performance." *See* AR 3-27, 37, 47, 57, 67. The area extending 150 miles from the contract area of performance encompasses some locations outside North Carolina. However, the government has represented that Ken Krause has been performing the contract for ten months and that it has undertaken no interstate transportation activities under the contract in that time. Hr'g Tr. 25:1-3 (July 20, 2011). Although contract performance could theoretically involve interstate transportation, the Solicitation does not appear actually to require the contractor to perform interstate transportation services. Because the performance of the contract does not necessarily involve moving goods interstate, it was reasonable for the contracting officer not to require Ken Krause to hold the licenses it would need to conduct interstate transportation of household goods for hire. There is nothing arbitrary or capricious about her decision in this regard.

Even if Ken Krause were required to transport household goods interstate, Nilson Van's argument would still fail. Nilson emphasizes the language of the Performance Work Statement, which requires all "prospective contractor[s] engaged in interstate transportation" to be "approved and hold authorization in their own name by the Interstate Commerce Commission." AR 3-101 (Solicitation, Performance Work Statement ¶ 1.4). Because the language says "prospective contractor[s]", Nilson argues that bidders must have authorization from the Interstate Commerce Commission before the contract is awarded.

The language of paragraph 1.4 is in tension with FAR § 52.247-2(b), which states that offerors "shall . . . obtain and maintain any permits, franchises, licenses, and other authorities issued by State and local governments," and which requires offerors to furnish copies of their authorizations to the government, if requested, "before moving the material under any contract awarded." The mandate that offerors shall "obtain and maintain" licenses and must provide copies of licenses before moving goods under the contract indicates that the required licenses and permits must only be acquired before performance, not before award. By suggesting that an offeror may acquire the requisite authorizations after bidding, FAR § 52.247-2(b) to some extent contradicts paragraph 1.4 of the Performance Work Statement which uses the term "prospective contractor" and the present tense, suggesting that licenses might have to be obtained before a prospective contractor bids.

Section 52.247-2(b) and paragraph 1.4 of the Performance Work Statement must be read together. Paragraph 1.4 begins by declaring that "[t]he provisions of FAR [§] 52.247-2, Permit, Authorities, or Franchises, are applicable for qualification to perform services under this regulation." AR 3-101 (Solicitation, Performance Work Statement ¶ 1.4). The most reasonable interpretation of the sentence is that FAR § 52.247-2(b) governs qualification. Despite the differences between paragraph 1.4 and FAR § 52.247-2(b), there is no indication that the Solicitation aims to supersede the qualification requirements of FAR § 52.247-2(b). In sum, FAR § 52.247-2(b) and paragraph 1.4 of the Performance Work Statement are best interpreted to

require a bidder to obtain the necessary authorizations to perform the contract before performance begins, not at the time of bid.

Finally, Nilson argues that Ken Krause needed to be registered as an interstate carrier, even if the solicitation only requires intrastate travel, because "the goods transported are engaged in interstate commerce." Pl.'s Mot. at 7. Paragraph 1.4 of the PWS requires a bidder "engaged in interstate transportation [to] be approved and hold authorization . . . by the Interstate Commerce Commission." The reasonable interpretation of "interstate transportation" in this context is transportation activity for which authorization is required by the Interstate Commerce Commission ("ICC"), not intrastate transportation of goods that have previously traveled in interstate commerce. Accordingly, because the ICC does not require Ken Krause to obtain authorization to transport goods only within North Carolina, Ken Krause had no obligation to gain authorization from the ICC.

2. *Storage facilities.*

Nilson maintains that Ken Krause was an irresponsible prospective contractor because it did not have the necessary facilities to perform the contract. Pl.'s Mot. at 7. According to Nilson, the facility Krause listed in its bid and in its Online Representations and Certifications Application ("ORCA") did not satisfy the facilities requirements in paragraph 5.8 of the Performance Work Statement. *Id*. at 8-10. The government responds that Ken Krause listed its principal business address, not the address of the storage facilities it intended to use in performance, Def.'s Cross-Mot. at 21, and that shortly after bidding, it properly identified the relevant storage facilities for the contracting officer to take into account in evaluating its offer. *Id*. at 21-22.

Krause listed its place of performance, both in its offer and in ORCA, as "Ken Krause Co[.;] 148 Rice Rd[.;] Vass[,] NC 28394." *See* AR 11-264 (Ken Krause Co. Bid, Box 8); AR 38-576 (Ken Krause ORCA Representation (FAR § 52.215-6 Place of Performance)) ("The offeror . . . , in the performance of any contract resulting from this solicitation, . . . does not intend . . . to use one or more plants or facilities located at a different address from the address of the offerer . . . as indicated in this proposal or response to request for information."). The Vass facility appears to be a location from which Ken Krause Company conducts business. However, it is neither the facility that Ken Krause intended to use or has used to perform the household goods contract, nor is it among the facilities the Contracting Officer inspected pursuant to paragraph 1.4 of the Performance Work Statement.

On April 14, 2010, Ken Krause e-mailed the Army's Contract Specialist to state that it intended to use facilities in Southern Pines, NC, and Carthage, NC, to store goods during performance of the contract. *See* AR 22-383 (E-mail from Ken Krause to Sharon Carter (Apr. 14, 2010)). The Contracting Officer, Contract Specialist, and a technical representative from the Directorate of Logistics inspected the facilities on April 19, 2010, took photographs, and determined the facilities met the requirement of the Performance Work Statement. *See* AR 1-8 to 9 (Agency Report (July 6, 2010)); AR 22-383 (E-mail from Carter to Krause (Apr. 16, 2010)); AR 25-388 to 418 (Photographs from Ken Krause Warehouse Inspection); AR 27-426 (Determination of Responsibility for Ken Krause (May 27, 2010)) ("[W]e found both

warehouses to be in full compliance with the Performance Work Statement"). Nilson does not appear to argue that there were any inadequacies in the Southern Pines and Carthage facilities.[8] Rather, Nilson appears to claim that Ken Krause's Vass location should have been evaluated instead, or that Ken Krause should have listed its other facilities in its bid initially.

There is plainly no need for inspection of a location Krause did not intend to use for storage to meet the Solicitation's requirements for storage facilities. The resulting question is whether Krause was an irresponsible bidder by listing the Vass address as its "place of performance." The Solicitation permitted Ken Krause to change its bid by e-mail. *See* AR 3-91 (Solicitation (52.214-5(c), Submission of Bids)) ("[B]ids may be modified . . . by written or telegraphic notice."). Ken Krause effectively modified its bid when it informed the Contracting Specialist via e-mail which facilities it intended to use to store goods under the contract. *See* AR 22-383 (E-mail from Krause to Carter (Apr. 14, 2010)). This e-mail also had the effect of modifying the intended place of performance in ORCA. *See* AR 16-353, 367 (Ken Krause's first ORCA certification of place of performance); AR 38-576 (Ken Krause's second ORCA certification of place of performance). Accordingly, Ken Krause did not violate the terms of the Solicitation, Performance Work Statement, or any pertinent provision of the FAR. Moreover, based upon the pre-award inspection conducted of the Southern Pines and Carthage facilities, the Contracting Officer reasonably determined that Krause had "the necessary . . . facilities" to perform the contract. FAR § 9.104-1(f). Accordingly, Ken Krause was "qualified and eligible to receive an award under applicable laws and regulations," and was a responsible bidder. FAR § 9.104-1(g).[9]

---

[8]Nilson notes that there is no indication that the Southern Pines and Carthage facilities meet the insurance requirements of paragraph 5.8 of the Performance Work Statement. Pl.'s Mot. at 10. Paragraph 5.8.5 provides, "Upon receipt of award[,] the contractor shall furnish to the [C]ontracting [O]fficer evidence of the kinds and minimum amounts of insurance covering work to be performed." AR 3-129 (Solicitation, Performance Work Statement ¶ 5.8.5). The Solicitation specifies that this information is only required to be submitted to the Contracting Officer "[u]pon receipt of award." *Id.* Accordingly, Nilson cannot contest successfully the decision to award the contract to Krause on the basis that Krause's insurance information is not in the administrative record. Krause had no obligation to deliver insurance information until after it received the award. As the government correctly noted, "[P]roviding insurance certificates is a condition of performance, not a bid requirement." Def.'s Cross-Mot. at 20. Whether or not the insurance requirements were met is irrelevant to the question of whether the Contracting Officer's decision to award the contract to Ken Krause was arbitrary and capricious.

[9]The government argues in its brief that Ken Krause's bid was *responsive* to the question of where its place of performance would be. *See* Def.'s Cross-Mot. at 25-28. Nilson neither alleged nor argued that Ken Krause's answer to the "place of performance" question was not responsive. Consequently, the court declines to discuss this non-issue.

B. *The Responsiveness of Ken Krause's Offer to the Requirements of the Solicitation*

1. *Registration in government databases.*

Responsiveness is determined "based upon the contents of the bid at bid opening." *VMS Hotel Partners v. United States*, 30 Fed. Cl. 512, 514 (1994) (citing *Honeywell*, 870 F.2d at 648-49). To be considered responsive, "a bid must comply in all material respects with the invitation for bids." FAR § 14.301(a). "Determination of whether a defect in a bid is material is committed to agency discretion." *Tel-Instrument Elecs. Corp. v. United States*, 56 Fed. Cl. 174, 177 (2003) (citing FAR §§ 14.301, 14.405), *aff'd*, 87 Fed. Appx. 752 (Fed. Cir. 2004). The contracting officer may waive or permit a party to cure minor irregularities. *See* FAR § 14.405 ("A minor informality or irregularity is one that is merely a matter of form and not of substance. It also pertains to some immaterial defect in a bid or variation of a bid from the exact requirements of the invitation that can be corrected or waived without being prejudicial to other bidders."); *see also* FAR § 14.301(a) (specifying "a bid must comply in all *material* respects with the invitation for bids" (emphasis added)).

Nilson first argues that Ken Krause was a non-responsive bidder because it was not properly registered with two government contractor databases, ORCA and the Central Contractor Registration, at the time of bid, as required by the solicitation. *See* Pl.'s Mot. at 10-11; AR 3-76 (Solicitation (FAR § 52.212-3)) (explaining that offerors must complete annual representations in ORCA or provide other information as specified in the provision). Ken Krause submitted its bid in early December 2009. The administrative record contains two versions of Ken Krause's ORCA registration — one with a certified validity spanning February 25, 2009, through January 6, 2010, *see* AR 38-563 (Ken Krause ORCA Registration); and another with a certified validity beginning on January 6, 2010, *see* AR 16-353 (Ken Krause ORCA Registration). The Administrative Record also contains Ken Krause's CCR, which indicates that it was valid when printed on April 9, 2010. *See* AR 15-346 (Ken Krause CCR). Ken Krause was awarded the contract on May 27, 2010, and the Army entered into the household goods contract with Ken Krause on June 1, 2010. *See* AR 20-421 (Contract Award Decision Statement (May 27, 2011)); AR 29-428 to 512 (Contract (June 1, 2010)).

The record shows that Ken Krause was registered with ORCA at the time of bid. *See* AR 38-563 (Ken Krause ORCA Registration) (certifying the validity of Ken Krause Company's ORCA registration from February 25, 2009, through January 6, 2010). As applied to Ken Krause's ORCA registration, Nilson's argument is meritless.

Although the record does not show that Ken Krause was registered with CCR at the time of bid, Krause's obligations were to provide the required information to CCR prior to award, not prior to bid opening. *See* FAR § 52.204-7(b)(1) ("By submission of an offer, the offeror acknowledges the requirement that *a prospective awardee shall be registered in the CCR database prior to award*, during performance, and through final payment of any contract, basic agreement, basic ordering agreement, or blanket purchasing agreement resulting from this solicitation." (emphasis added)); *see also Bilfinger Berger AG Sede Secondaria Italiana v. United States*, 97 Fed. Cl. 96, 145 (2010); *JGB Enters., Inc. v. United States*, 63 Fed. Cl. 319, 322 (2004), *aff'd*, 497 F.3d. 1259 (Fed. Cir. 2007).

Nilson has the burden of demonstrating that the Contracting Officer's award to Ken Krause was arbitrary and capricious.  There is no evidence Ken Krause was not registered with CCR and ORCA in a timely manner.  Indeed, it appears Ken Krause was registered with CCR even earlier than the administrative record demonstrates because the Contracting Officer's report to GAO stated that "[t]he Contract Specialist looked [Ken Krause and Nilson Van] up in CCR and ORCA on the bid opening date, 8 December 2009, finding registrations of both."  AR 2-16 (Statement of Contracting Officer Gloria A. Carr (July 6, 2010)).  Given these circumstances, Nilson Van has shown no grounds for overriding the Contracting Officer's determination that Ken Krause's bid was responsive.

   2. *Classification within ORCA.*

   Nilson finally argues that Ken Krause's bid was non-responsive because of a "deficiency" in its ORCA registration.  Pl.'s Mot. at 11.  Nilson explains that Ken Krause's 2009 ORCA Certification "only certifies that Ken Krause Company was recognized by the North American Industry Classification System . . . as an 'Other Building Finishing Contractor[],' code 238390."  *Id.*; AR 38-571 (Ken Krause ORCA Registration).  It points out, however, that the Solicitation lists NAICS code 488991, "Packing and Crating," as the identifying code for the Solicitation.  *See* AR 3-17 (Solicitation, Box 10).  Nilson argues that Ken Krause was nonresponsive to the solicitation "by not possessing or designating" the "Packing and Crating" code "with its ORCA registration."  Pl.'s Mot. at 12.[10]

   The Solicitation contained no requirement that Ken Krause indicate it would perform packing and crating services under NAICS 488991 in its ORCA registration.  Regardless, Ken Krause stated in its bid that it "agree[d] to furnish and deliver all items set forth or otherwise identified above and on any additional sheets subject to the terms and conditions specified herein."  AR 11-268 (Ken Krause Bid, Box 28).  This statement establishes responsiveness to any requirement to perform services under NAICS 488991.  *See VMS Hotel Partners*, 30 Fed. Cl. at 517 (noting a bidder was responsive where it "committed itself to satisfying all of the requirements contained in the Solicitation").

   The Solicitation's identification of NAICS 488991 must be understood in context.  Under box 10 of the Corps' bid solicitation form, the award was to be set aside for small businesses.  AR 3-17.  That section of the form also indicated a "size standard" capped at $25.5 million in annual revenue, and a "NAICS" classification of "488991."  *Id.*  By referencing NAICS 418899 under box 10, which concerned bidders' size and ownership, the solicitation form indicates that the NAICS code was listed to specify the required small business status of bidders, not to specify the services a bidder must have had past experience providing.[11]  Contrastingly, box 20 of the solicitation form, entitled "Schedule of Supplies/Services," did not require NAICS 488991 classification.  AR 3-17.  Rather, that section required, in relevant part that the "[c]ontractor . . .

---

   [10]Nilson acknowledges that Ken Krause's CCR included NAICS code 488991.  Pl.'s Mot. at 12; AR 15-347 (Ken Krause CCR).

   [11]Nilson does not dispute Ken Krause's small business status.  Hr'g Tr. 12:9-15 (July 20, 2011); *see also* AR 15-347 (Ken Krause CCR).

furnish all personnel, equipment, facilities, supplies, services and materials, except as specified herein as Government furnished, for the preparation of personal property of Department of Defense personnel for shipment and/or storage and related services through the Direct Procurement Method (DPM)."  AR 3-19; AR 3-18 (Solicitation, Box 20).  In short, there were no deficiencies in Ken Krause's bid or ORCA registration that rendered it nonresponsive.

Even if Ken Krause had been required to reference NAICS 488991 in its ORCA registration, there would be no merit to Nilson's responsiveness claim.  Although "a bid must comply in all material respects with the invitation for bids" to be considered responsive, FAR § 14.301(a), "[d]etermination of whether a defect in a bid is material is committed to agency discretion."  *Tel-Instrument Elecs. Corp.*, 56 Fed. Cl. at 177.  The contracting officer had discretion to waive a "minor . . . irregularity."  *See* FAR § 14.405.  Accordingly, Nilson's argument that Ken Krause's bid was nonresponsive fails.

## CONCLUSION

For the stated reasons, Nilson Van's Motion for Judgment on the Administrative Record is DENIED, and the government's motion for Judgment on the Administrative Record is GRANTED.  The clerk shall enter judgment for the government in accord with this disposition.

No costs.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge